Appellants, Roger Vinson, Mr. Byron for the Appellants, Mr. Klayman for the Appellants, Ms. Cohen for the Amici PRI Electronics Frontier Foundation, and Mr. Smith for the Amici PRI Center. Thank you. May it please the Court, I'm Thomas Byron from the Justice Department here on behalf of the government defendants appellants. I'd like to reserve ten minutes for rebuttal, please. The district court in this case improperly enjoined the operation of an important government intelligence program that's designed to identify known and unknown contacts of individuals associated with international terrorist groups. The court's injunction was improper for multiple reasons. First, the plaintiffs have failed to establish that they have standing to challenge the program at all, because they allege only, first, that they are subscribers of Verizon Wireless. But Verizon Wireless, as the intelligence surveillance court, and therefore there is no evidence in the record or in the public domain that demonstrates that any information about Verizon Wireless subscribers has been acquired pursuant to the Section 215 program. Doesn't the government rely on the proposition that the suite of numbers is virtually universal? And if that's the case, is it safe to No, Judge, it's just the contrary. We made clear in the footnote in our opening brief that, and the Foreign Intelligence Surveillance Court itself has made clear as well, that under this program, the government does not and never has acquired all or nearly all of the telephone call data records of Americans as part of the program. Therefore, it's improper to assume, it would be only speculation, in fact, to assume that the subscribers of any particular telephone company other than the one company, Verizon Business Network Services, which has been acknowledged by the United States for a three-month period last year to have participated in the program, that any other company in any particular period had participated subject to a FISC order. For that reason, the district court's assumption that because Verizon Wireless is a large telecommunications company, therefore, it must have been participating in the program. Is it the largest? I don't know whether it's the largest telecommunications company. Judge Williams, the district court pointed out that it, I believe the court said that it was the largest of the wireless telecommunications companies. But remember, here, there is no evidence that either Verizon Wireless or any other provider has participated. And that is important to maintain the classified nature about the details of this program and how it operates. So, unfortunately, I'm constrained in what I can say, of course, about it. But what I can say is that, as in the Amnesty International case in the Supreme Court, it's plaintiffs' burden to demonstrate standing, and they failed to do so here, not only because their theory is that as subscribers of Verizon Wireless, which they cannot substantiate, the district court here acknowledged that there's no evidence that Verizon Wireless participated. But also because the injury that they assert is not based on the mere collection of metadata itself, but on the possibility that the government might misuse that metadata to compile dossiers about the personal activities of these particular plaintiffs. If there is an invasion of privacy by the collection of the metadata, and Supreme Court in Jones recognizes, even in the opinion of the court, that privacy is the protected interest under the Fourth Amendment, then is it necessary that they show there's any use against them, or is just the collection by itself an invasion of privacy sufficient to meet that element of standing? Well, just until both as to standing and on the merits, we think that it's not... Let's stay with standing for the moment. Sure, Your Honor. So as to standing, the plaintiffs assert that in their briefs, but not in their complaint or their evidence in support of their preliminary injunction motion, that mere collection might be sufficient to show standing. But it's important, then, to ask in what way that would harm a protected Fourth Amendment privacy interest. No, no. The question is if it's not a harm in itself to invade the privacy interest without showing any further harm. If there were a privacy interest in the metadata that a company maintains in its own business records about the calls of its subscribers, where that company maintains its business records for its own business purposes, such as fraud prevention and billing, then if the court were to find that there were a protected Fourth Amendment privacy interest in that information by the subscribers, that argument might be sufficient. But here that argument is precluded by Smith itself. You're completely merging the merits and standing. Well, Judge Williams, that's why I mentioned in response to Judge Sentel's question that I think the point is relevant as to mere collection, as to the argument about whether mere collection is sufficient, both as to standing and the merits. In other words, there are similar points to be made. There is no protected constitutional interest that's been invaded by the mere collection of the business records of a telephone company. What, if anything, beyond the – all right, let me back up. Smith concerned the information or data as to whom the caller had called. Yes, Your Honor. Your Honor, is the metadata that you're collecting here broader than that? Does it go beyond the information as to who has called? Well, Judge Sentel, I think it does in some senses, but not in a material way. All senses it is, then. We'll be the judges of materiality. You tell me what it is. I think the question becomes, is there any way in which the particular metadata that's been authorized by the Foreign Intelligence Surveillance Court to be turned over from a telephone company is different from the metadata that was at issue in Smith? So the metadata at issue in Smith was acquired by a pen registry. It was the number dialed from the subject's, the defendant's, phone. In this case, that information is included as well as the number of the phone that's calling, or both calling and receiving numbers are acquired. So in that sense, it's like a trap and trace device as well, which was also the kind of technology that's been around for a long time. It also includes the information about the call, when it was placed, how long it was before it was concluded, the date and time, for example. There are some unique identifiers about telephones that are listed in footnote 2 of the primary orders that are included in the appendix here that include things like IMEI, IMSI. These are just identifiers associated with telephones and devices. So that information is acquired. But, again, this, it seems to us, is very much the same kind of information that was at issue in Smith. If I may interrupt, what, if any, information is gathered about the physical location of wireless callers, if anything? So just until what is not included. Cell tower type information. I'm sorry, what? Cell tower type information. Cell tower type information is not included in this metadata, and that's made clear in the FISC orders. The courts have specified that it's not included. In passing reference, Mika suggests that there's something about trunk identifiers. Trunk identifiers are not like cell tower information in the sense that they could be used to identify a location. They just identify where a call is routed and it's interconnected within a network. But it's not in the same detailed or closely relevant way of cell site location information. And so because the FISC orders, the judicial orders that authorize this program and impose limitations on it, specify the type of metadata, the court in that case, in the many orders that it has issued, has specified that it has concluded this kind of metadata is within the Supreme Court's decision in Smith. So that's a judicial determination by the FISC itself. We think that the Supreme Court's decision is therefore dispositive of this case and requires reversal of the injunction because this is not a search under the Fourth Amendment. As the Supreme Court emphasized, there is no reasonable expectation of privacy in the numbers one dials to complete a call, nor in the other information as the FISC has concluded about when a call takes place and the like. This information also does not include any content of communications and content of communications is specifically accepted in the FISC orders. Just as the Supreme Court in Smith specifically pointed out that the content of communications had been at issue in Katz but was not at issue in Smith and therefore the court flagged that aspect of it as another relevant consideration. We think it's likewise relevant here and so does the FISC. And finally, this information is being acquired not from plaintiffs themselves nor even from a pen register capturing the information during its transmittal from a subscriber to the telephone company as in Smith, but from the business records of the company itself which maintains them for its own purposes. We think that's an additional reason why this information is not subject to the protections of the Fourth Amendment in this context. So just as a business may be required to turn over its records in the context of a subpoena, grand jury context, et cetera, cases we've cited there, it's very clear that this information is owned by the telephone company not by the subscribers themselves. In Maynard, we read Smith to admit distinctions of degree, so that was the basis for finding this continuous pursuit of Jones over I guess a week or so. If that's true, if that's a limit on Smith, then does it make a significant difference that these data are collected for a five-year period? No, Judge Williams, because remember one of the differences here is that unlike a GPS tracking device which is placed on an individual vehicle for the purpose of tracking that individual as in Maynard and Jones, here the data is actually acquired on an ongoing basis by the telephone company for its own business purposes. So one of the points that this court and I think even perhaps the Supreme Court, one of the opinions might have made was you don't expect the government to be tracking your movements moment to moment 24 hours a day for 28 days, whereas here you do expect and you have to expect that when you dial a phone number, your telephone company has a record of that phone number every time you use the phone. But certainly Maynard seemed to contemplate the view that your expectations would be different depending upon the degree and five years seems like substantially longer than one would expect. In fact, I don't think the telephone companies kept them that long for required to do so, right? It's not clear in the record of this case, Judge Williams, as far as I know, about the length of time the telephone companies keep the data, but the point is that there's a 90-day period during which the FISC orders are operative and require the telephone companies to turn over the information from their records to the government for purposes of this program. Now, the government may then retain it for five years, but that's not the same as asking whether the telephone company must keep it for five years. This is an order from a court requiring turnover for a 90-day period. That's the relevant consideration for purposes of discerning whether there's a sort of consideration rather than, I mean, how can we discard a five-year term that the government keeps it? Because under Smith and Miller, the question is whose information is this and is there an expectation of privacy by another person? And here the information belongs to the telephone company just as the financial records in Miller belong to the bank. And the fact is once the bank has them or the telephone company has them, it can turn them over to the government. That's the risk assumed. Phone company ownership, an on-off switch, right? Phone company owns it, no expectation of privacy. That's not the view that the court took in Maynard. Well, I think in Maynard and Jones, the question was quite different, Your Honor. The question there was not about whether there had been a third party that had the information. And that's the key point about Smith and Miller and why we think this case is governed by that Supreme Court precedent and really not by Maynard and Jones. In Maynard and Jones, the courts were concerned, this court and the Supreme Court, were concerned with the question about whether the government had intrusively acquired the location information, not from a third party but from the defendant's movements directly. Here that's just not at issue. Here the acquisition of the information comes from the business records of the telephone companies. This third party approach creates a really nice, bright line. But does it matter to whom the information is conveyed? For instance, medical records, that would be, you know, a third party's records. But could you draw the same line? Judge Brown, I'm glad you mentioned this because it's really important to recognize in the context of medical records, just as in the context, by the way, of telephone records, wiretap provisions, et cetera, Congress has acted to protect privacy in all of these areas. For example, following the Miller case, Congress passed a statute governing the secrecy of bank records. Following the Smith case, Congress passed a statute governing wiretaps. HIPAA, in your example, Judge Brown, would govern the restrictions, would impose restrictions on the proper use of medical information. So too here, FISA imposes requirements that are then enforced by the Foreign Intelligence Surveillance Court. And those protections are essential to understanding the program and the very limited intrusion on any privacy interest. Now, we've made the point that Smith says there's no Fourth Amendment search at issue here, but it's also important to recognize that even if there were a Fourth Amendment search, this would be a reasonable intrusion because it is so limited because it is governed by those protections in the FISC orders that ensure a prior judicial approval, that there's a reasonable articulable suspicion that a particular selector is associated with an international terrorist group that only permit use of the metadata to, that limit the use of the metadata to seeing only the two steps of contacts from that RAS-approved, reasonable articulable suspicion-approved selector. Those protections are very important to understand the way in which this program is tailored and the way in which any intrusion on privacy, whether protected or not, is so limited and therefore quite reasonable in light of the important government interest served by the program. So the government doesn't take the position that this falls outside the warrant requirement. You're actually saying it falls within it, and you're right? No, Your Honor. You do say it falls outside. We do say it falls outside the warrant requirement. No warrant is required here, just as no warrant is required, for example, in drug testing students, athletes, or drug testing, customs, in the Von Raab case, certain government employees that are- so there are certain programs, or drug driving checkpoints, for example, there are certain programs that have been recognized to be reasonable, even to the extent they do implicate Fourth Amendment interests, and in those contexts the warrant is not required but a reasonableness tested interest. So in your view, what is it that the FISA court provides, since you're not meeting some idea of a warrant requirement, reasonable suspicion and all of that is part of what they're looking at, but your view is that you wouldn't need that intervention, it's just that it's statutorily required? Well, Judge Brown, yes, it is statutorily required, and the role of Congress and the court in this case ensures that the important privacy interests that the President himself recognized in his statements earlier this year are protected as part of this program. But it's important to recognize, too, that there are two steps to our Fourth Amendment argument. The first part of it is Smith and Miller, in those cases, ensure and guarantee that this information is not covered by the Fourth Amendment at all. It's not a search. There's no reasonable expectation of privacy in the business records of the third party. But even if it were a search, the second part of our argument is that it would be a reasonable one that satisfies the requirements of the Fourth Amendment because it is so carefully tailored and the privacy protections are so expensive. I'd like to reserve the remainder of my time for rebuttal, if I may, unless the Court has further questions. Thank you, Your Honor. You may. Good morning, Your Honors. My pleasure to be in front of you on a case that has monumental importance. In fact, it was Judge Laramie who said at the lower court level that this case is one of the pinnacle of national interest. That was reaffirmed, in effect, in the recent Riley decision of the U.S. Supreme Court, which has a lot of analogous circumstances to this case involving cell phones. Before you get to Riley, can we talk about standing for a moment? I'd love to. Okay. It's your position that just querying the database is a search, correct? That's correct. In other words, there are, in your view, two intrusions here. One is the collection. One is the query. The collection is enough at the inception, but what can aggravate that without a showing of reasonable suspicion or probable cause, which is not present here for the plaintiffs, and in particular for all Americans who have no ties to terrorism, it's an aggravated violation of the Constitution. But just collecting the data is sufficient to implicate the Fourth Amendment, as Judge Santel pointed out. At footnote number one of the Verizon order at issue, the fifth quarter of Judge Vinson, he defines what metadata is, and that's buttressed by the affidavit of expert witness Edward Felton, which is on the record. There are two affidavits, and those are very important, and I know your honors have read them, but I'm going to review a little bit of them right now. The metadata as defined by the fifth court, for purposes of this order, telephone and metadata includes comprehensive communications, routing information, including but not limited to session identifying information, for example, originating and terminating telephone numbers, international mobile subscriber identity. You can see the government would like you to think they don't get into identities, but they do. I'm sorry. The identity comes from the phone number, right? That's correct. That's correct. As in Smith. I'm sorry, Your Honor. As in Smith. That's just one part of the metadata. But from that, as expert Felton testifies to, a computer expert at Princeton, from that you can derive virtually every aspect of your personal and professional lives, who you met with, the duration of the call. That's not, of course, an issue which would be involved in a pen register or a trace and track. Doesn't your standing theory really turn on a kind of telescoping, an elimination of the imminence requirement? Because the harm you're concerned with is what follows not merely from the so-called querying, but once the querying is complete from examination of the particular phone transactions to see what's going on. And that occurs, that's two steps away from the collection. So by turning collection into a standing creating event, you've eliminated imminence. Your real concern, and this is expressed very well, I think, and I believe it's the ACLU brief, is that there be this data that then leads to government officials doing something. The ACLU brief did make that point, and we make that point as well. But it's not an issue of just doing something. They've done something when they obtain our metadata, which is highly invasive, and which leads the government to have the ability, when you take all of the factors of metadata together, and my esteemed counsel here from the government admitted that it goes far beyond a pen register or a trap and trace. It's a combination. I didn't hear that. I missed the admission. Well, it's a tacit admission, okay, because what he did was he broke out. Very, very tacit. He broke out the various components, which go far beyond a pen register. You know, it's ironic. With some humor. Could you just stop there? Explain to us how it goes way beyond the pen register. Because you're able to not just get information with regard to who an individual has called, but also calls into that person. Then you go two steps down the line, and it multiplies. As Judge Leon pointed out, you know, they claim they've only got identifiers for one period of 300 identifiers. Judge Leon does a very good job at documenting how 300 identifiers leads to hundreds of millions of, in effect, identifications. And also, Expert Felton testified under oath in his affidavit. The identifications never occur until the querying step is complete and the examination process begins, right? That's an interesting question, okay. The answer is that's what the government says happens. But unfortunately, and it's broken into Section 215, and they rely heavily on the so-called minimization procedures, the Inspector General of the NSA and other intelligence agencies have documented, in a short period of time, over 2,000 violations of the use of metadata. 2,000 workers, and this is in the record, from the NSA, and it's very broad in terms of who can get access. It's not defined what their expertise has to be, have actually gotten in to the telephone records of their loved ones, their girlfriends, their boyfriends, husbands, and wives. This has been repeatedly misused. So to come in front of this court and to say that we don't get identifiers, we don't get in to people's underwear, so to speak, is absolutely false. There's a documented record that Judge Leon went through, and we briefed it, of the NSA and our National Intelligence Director not telling the truth to Congress, in effect, lying under oath. But you don't have to go that far, because the very trapping, and that's why it's a good question, Judge Williams, of all of this information, for a long period of time, as set forth in Jones, as set forth in Maynard, and other cases, without a particularized showing of a reasonable suspicion that the subject is communicating with terrorists or terrorist groups or committing a crime, is a violation of the First, of the Fourth Amendment. And it's also a violation of the First Amendment. I'm a public interest lawyer. I'm someone who challenges the government. I have my clients, Charlie and Marion Strange in the courthouse, who have been communicating with me over the death of their son in Afghanistan, who died in a shoot-down of a Chinook helicopter in a mission called Extortion 17. They allege that the government has covered up those facts. Michael Strange, their son, was an NSA cryptologist. My clients have been critical of the government. We have on the record, and Judge Leon didn't rely on it, affidavits showing that their computers have been accessed by the government. That's in the record. And I'm a lawyer, and the ACL makes the same argument. Simply by obtaining my metadata, seeing who I'm calling, and having, in fact, going three steps down the line to what I do violates the most sacrosanct privilege in the law, my attorney-client privilege. So this case needs to be seen not just in the context of what's happening to all Americans, which is perhaps the biggest violation of freedom and constitutional rights in American history, but it has to be seen in the context of the particular plaintiffs in this case, who have had their attorney-client privilege desecrated, destroyed, violated. The desecration of which you speak occurs if and only if government officials of some sort have reached the third step of this process, that is to say moved from collection through querying to actually examination of the numbers and following out who the holders of the numbers are and so forth. So, again, it seems to me you're telescoping the process in a way that obscures analysis. We're not telescoping it, Your Honor, because the government has no right to that information, any more than in Wiley, as Chief Justice Roberts pointed out with great strength, that you couldn't have wireless searches in the years leading up to the Revolution going into people's homes. There's no right just to grab information that doesn't have to be there. If it's like Wiley, then it's like Smith, isn't it? Excuse me, Your Honor. Wiley involved cell phones that have all sorts of information on them. Isn't this more like Smith than it is like Wiley? No, they're trying to explain Smith beyond PIN registers and beyond trap and trace. Smith basically, for all intents and purposes... What is the information they're getting here that is beyond what you get with a PIN register or a trap and trace? Yes, it is. I said, what is the information here that you're getting that is beyond what you get with a PIN register or a trap and trace? Because they're able to, with the confluence of factors, I was reading what metadata is, and as expert witness Felton testifies to, and frankly, they don't rebut that. They just rely on their own statements to rebut that. I don't understand my question. Yes, I understand your question. The confluence of information they're able to obtain through metadata allows them to piece together where an individual is, the duration of a call... No, no, but where it is part. His social... Where it is part. Is that part of the metadata that they collect, the location of the person? It can be obtained that way, yes. Well, it can be obtained that way. That's a different question. Is it being obtained? I think it's being obtained that way. I'm told by counsel for the government that they are not collecting the cell tower data, which is what would tell you where the person is. Now, you're telling me that they are collecting something that tells them where the person is? I'm telling you they are. And I'm telling you... What is it they're collecting? What in the record shows me that they are collecting data that says where the person is? The references in the record to the Inspector General's report, which are in the record, that they have violated Section 215 and the Constitution of the United States. It's in the record, Your Honor. That's where it is in the record. But the detail... It's the amount of documents in the record. We understand people claim violations of the Constitution in Section 215. The question is, how is the data acquired different from the data acquired in a pen register? We keep asking you that, and you keep debating. Well, and the difference is, and Judge Land pointed it out quite well, is that it's not just simply incoming phone numbers or outgoing phone numbers. It's incoming phone numbers, which are... Well, incoming would be obtained by track and trace. Yes, I know that. Yes. So what is it that goes beyond the data that could be obtained by a pen register plus track and trace? Trunk identifiers, telephone calling card numbers, and time and direction of the call. What does the record show trunk identifiers give you? Yes. Excuse me? What does the record show trunk identifiers give the person who's looking at them? The record, and I urge you to look very closely, as I know you will, the affidavits of Edward Felton, which are unrefuted other than the bald denials of the government, which, frankly, are not to be believed. The reality is that this can all be pieced together from what they have to identify information and to, in fact, locate where a person is, the duration of their communication, and every aspect of their social and professional lives. Those affidavits... All right. Tell me to look carefully. Can you tell us where to look carefully to find out that it says where a person is, that what metadata they're collecting shows where a person is? Don't tell me to look carefully. Tell me where to look to find that it shows where a person is. What I'm saying, Your Honor, is this. What I'm asking you is, what in the record, you made the statement just now, that the metadata they're getting will show where a person is. I'm asking you to tell me where in the record I would find that. You'll find it in the affidavits of Edward Felton. Your Honor, I'm looking at that right now. Yes, I'm trying to find treatment of the trunk aspect, which I don't. I mean, it seems to me it makes a very good case that once you get to what I call the third step, the actual analysis of the data with respect to a particular telephoner, you can get an awful lot of data. I don't see him... Of course, you can obviously draw inferences from the location of the particular landlines, but I don't see him making a case on how the trunk data has any effect at all. I'd like to reserve some time. I'd be happy to point that out in rebuttal. No, if you're going to point it out, point it out now, please. We're asking you now. You tell us now. Unless you need to look it up before the rebuttal. I'm sorry if you need to look it up. Look it up. I'm sorry. Well, he says it particularly. I mean, it's a very detailed affidavit. But he points out, for instance, in the context of public interest groups, how you can tell who the donors are by the duration of the call, that kind of thing, and that you can, through trunk identifiers, find the location of an individual. Remember that in Smith, the government found out that Smith was making abusive phone calls. I'm not sure that you can get much more extreme than that. Look at paragraph 118 of the Felton Affidavit. Eighteen of the Felton Affidavit, Your Honors. The information sought from Verizon also includes the trunk identifier of telephone calls. This provides information about how a call was routed through the phone network, which naturally reveals information about the location of the parties. For example, even if the government never obtained self-site location information about a call, trunk identifier information revealing that a domestic call was carried by a cable from Hawaii to the mainland, the United States will reveal that the caller was in the state of Hawaii at the time the call was placed. And what's important, Judge Leone, I think one of the most important findings in his ruling was at page 57, where he says, No court has ever recognized a special need, because they're trying to rely on special needs here too, and that's an extreme circumstance, to justify continuous daily searches of virtually every American citizen without any particularized suspicion. In effect, the government urges me to be the first non-FIS judge to sanction such a dragnet. And Your Honors hit on this before. This is a long-term proposition. It's different than a pen register. It's different than a tracer trap. There's no particularized showing of probable cause. To simply grab these records because the government can do it. Pen registries don't require probable cause. Pen registries do not require probable cause. Well, but the statute 7215 requires a reasonable suspicion. And we're working under the statute as well here, Your Honor. And we're not talking about... Excuse me. You've jumped ahead to the actual third step, the examination of the calls. You've never attempted to show standing there, because there's no data in the record suggesting that your calls have been examined. Yes, there is, Your Honor. We have my affidavit and the affidavits of Charles Strange. That's in the record. And how do those establish that those calls have been actually examined? Because I am receiving telephonic communications that I never made, and people are getting them from me that I never made. And Mr. Strange's computers have been violated. That's in the record. Say it again, what it is, what is the phenomenon that you attribute to this? The phenomenon is that telecommunications have been breached. What is the evidence of that? Well, we put forward the evidence in our affidavits. The government doesn't refute it. They say we can't confirm or deny. They had an opportunity, the government, the government had an opportunity to reveal to Judge Leon in camera what was going on. They chose not to. It's heads I win, tails you lose. They hold the cards. The American people be damned. I'm still trying to get clear what phenomenon it is from which you infer that your calls collected in this program have been not merely turned up in a query but then examined. Number one, I want to make clear here what our argument is. The gathering of the information at its inception is itself a Fourth Amendment violation. I understand the claim. Okay. Secondly, there has been a showing that under the minimization procedure, so they claim to protect identities and locations, that they have been repeatedly violated by the NSA and the other government defendants, repeatedly. You still aren't answering my question. What is it that has happened to you that shows that it must have come from the abuses or exercise of rights under Section 215 under this program? The totality of the evidence, the nature of metadata, the fact that we have had invasions into my cell phones and into the computers and cell phones of Mr. Strange. What are the invasions? The set forth in Navajo. That could be one instance. The strangers are on a computer and all of a sudden a picture is taken of them purportedly by some entity related to the FBI. They don't have a camera on their computer. It's being done that way. They're getting calls from Afghanistan, strange calls that have nothing to do with their having communicated with Afghanistan with regard to their dead son. This son was an NSA agent. That sounds very peculiar. I'm not sure how it links up to this program. Regrettably, Your Honor, regrettably, it's not peculiar because our government, and I'm a former Justice Department lawyer, I'm the founder of Judicial Watch and now Freedom Watch, no longer with Judicial Watch but I founded Freedom Watch. The regrettable fact is that the government has not been telling the truth to either the lower court, Judge Leon, to Congress. We had the Director of National Security lie under oath, commit perjury with regard to this program. We have whistleblowers, Edward Snowden, and the government had to admit that they were doing this only because they were forced to do so. And as Judge Leon pointed out, the government holds the cards. They come in here arrogantly. I'm not disparaging these lawyers, but the government as a whole comes in here arrogantly and says we're above the law. We don't have to tell anybody what we're doing. And by the way, since we don't have to tell anybody what we're doing, we win. We'll get to continue doing it. You know, it was Thomas Jefferson who said, our founding father and second American president, when the people fear the government, there's tyranny. We have tyranny. And if King George III had had the same powers as this NSA, our founding fathers would have never gotten to Philadelphia. They would have been picked up, arrested, and executed before they had a chance to sign the Declaration of Independence. This is not an insignificant matter. This is not an academic matter. This is a matter of our rights as a people to be free from having the government stand over our shoulder. And we have a First Amendment claim here, too, a chilling effect on freedom of speech, freedom of association. I can't talk on the phone anymore. That's on the record with my clients to feel that they will use identifying information and reveal attorney-client privilege. This is the most outrageous abuse of freedom in our history. It's not to be taken lightly. And I took offense at the government coming in here and saying, we hold the cards. You're not entitled to know. This is exactly why we fought the revolution. It's why, Your Honor, we have our faith in you. You're our own protection between this tyranny. And as even Chief Justice Roberts pointed out, if the police don't step in here, then we are going to be in the streets again, regrettably. And I don't want to see that, and I know you don't want to either. Thank you, Mr. Cohen. Thank you. Good morning, Your Honor. May it please the Court, my name is Cindy Cohen, and I represent the Electronic Frontier Foundation, the American Civil Liberties Union, and the ACLU of the nation's capitals as a NICI in this case. I want to thank you very much for giving us the opportunity to address you here, and I'm happy to answer questions of a few things I would like, based on the commentary before that, I hope I can assist you in sorting through the situation. First, we don't believe that Smith v. Maryland controls this situation and that the government is attempting to expand Smith to cover a program that is significantly larger than what Smith had to do it, which were just the calls made by a suspect over three days. This is the untargeted mass collection of the communications patterns of millions of people over many years and kept for five years. This information isn't volunteered, which was the center argument in Smith. Certainly who calls you isn't information that you volunteer to the company. I thought Smith acknowledged that the companies didn't give telephoners a choice as to whether they would have the data that was recorded there recorded. Well, that's correct, but what Smith was gathering was just the pen registers. It was just the numbers dialed out. It didn't even include whether the call went through, much less the duration of the call or the patterns of the calls that are happening here. So it's all information. Has the Smith principle been applied to Trap and Trace as well as the pen registers? It has, but some courts are on it. It has not by the U.S. Supreme Court, and I don't believe it has by this court either. Okay. So, but, yes, there are some cases out there. If that's the case, that the Smith principle applies to Trap and Trace as well as pen registers, then it does cover the kind of data that you're talking about or where the call comes from or what number the call comes from. I think that's correct, Your Honor, but I think what's going on here is significantly bigger, and the government is trying to cram a very much larger program involving a lot more information that they ultimately can receive into a pretty tiny box in Smith. The difference, then, between Smith and the present case is one of magnitude rather than kind. I think that's fair. There is a little more information being gathered. I think trunk lines definitely give you a rough location of somebody, which you wouldn't have gotten with a pen trap. I think the IMEI and the IMV, the identifiers, that one is an identifier of your phone, the other is the identifier of the SIM card in your phone, provide very significantly more detailed identifying information than just a phone in. If we go back to the trunk identifier, that, at best, gives you some information about location, but in the era of Smith, the phone number itself gave you conclusive information about a particular geographic point, did it not? Well, it gave you the area code and probably the rough location. It gave additional information. Yeah, that's the easiest pie to get, right? Yes, as is the identity of the person whose phone is being used. The identity of the location. Correct. Because there were landlines. Yeah, and I think there is additional information being gathered here. I don't think that's the most important thing that's different here, but it is true that there's additional information being gathered here, and the government obviously wants that information for a reason. You know, in Knox, just four years after Smith, the court recognized that it was going to think differently about gag net collections than it might think about the targeted collection that was at issue in Knox. And in Smith itself, in footnote 5, the Supreme Court recognized that in situations in which the original expectation of privacy had been perverted for one reason or another because the government came out and admitted that they were spying on everybody, that you might have to go back to a normative approach. So I think if you look at Smith itself and you look at Knox later, and if you look at Riley and Jones, you see that the Supreme Court doesn't seem to think that it's stuck in this little box, that if metadata, then we're done, or if third party, then we're done. These are both factors that go into a calculus about reasonable expectation of privacy. And once you start thinking about that as a calculus, you can see that in Riley, the court said just because you could get a small amount of information from somebody's pocket doesn't mean that we have to be blind to the much, much larger information you can get from somebody's smartphone. We can think about those differences. We can also think about the differences in time. In Jones, the concurrences in Jones say we're not stuck in this small box of Smith v. Maryland. We can look at the very big difference that the amount of time that somebody's location is being tracked might make, whereas a single point in time, maybe no reasonable expectation of privacy. At some point between that and 28 days, a reasonable expectation of privacy. That's where Justice Alito's concurrence and I think Justice Sotomayor's concurrence take you to. I'm sorry. Jones involved what otherwise would have been public knowledge, which became an invasion. I'm talking about in the view of the concurrence, not the trespass theory. What otherwise would have been public knowledge just by observation became an invasion of privacy only because it created the mosaic. I'm using a phrase they didn't use. In this case, applying Smith, the data that's being gathered was not public knowledge by observation, but was willingly transmitted to a third party. Correct. If that is not an invasion at all, then does it become an invasion because there's a lot of it? I mean, does a thousand times nothing not still equal nothing? I think a thousand times nothing, well, obviously I'm not going to go under math with you here, but I think there is a distinction. The Supreme Court didn't follow my math in Jones either. No, no. You know, I do think that there is a difference of kind that can come from a difference in scale, and I do think that the Felton Declaration gives you some examples. We gave you some in our amicus brief as well. I don't think that the reasonable expectation of privacy analysis should be blind to those differences. Do you think that the reasonable expectation approach is the correct approach? I do think the reasonable expectation of privacy approach is the correct approach. I think that the metadata here, especially aggregated, you know, you know a lot more. You know, if you know that I got a call from my husband, you know one thing. If you know I got a call from my husband, who got a call from his oncologist, you probably know a little more. So the aggregation actually gives a more invasive picture into somebody's life. That's true if you get to that step where you're doing those kinds of queries. But the conceptual implications here, it seems to me, are vast, because on the one hand you're saying people continue to have a privacy interest in information they have voluntarily conveyed to a third party. And that is, I think, different from any way that, I mean the reason that Smith works is because it draws that very clear line. It says, okay, if you've given this up, you no longer have a privacy interest in it. So if we go with you, you know, if we follow the line of reasoning that you have, how do the police ever figure out what it's okay to look at and what it's not okay to look at? Because they'd have to, I suppose, look at your subjective intent. Well, I think that, honestly, those are difficult questions that I think a court may have to address at some point. I don't think they're at issue here because we've got the government collecting everybody's records over a 13-year period of time and keeping them for five, so sometime in the future. Yeah, but how does that change the fact that this information was voluntarily conveyed to somebody else? And, in fact, if there is an invasion of a right, it appears to be the right of the telecoms because it's their business records, right? Well, I don't agree. And the third-party doctrine I don't think is an on-off switch for people's privacy interests. It wasn't in the Ferguson case in 2001, the U.S. Supreme Court, the hospital records case that you referenced earlier. I don't think the Constitution has nothing to say about whether the hospital can just hand your information over and that it's only Congress that's ever said, you know, that it matters, that the Constitution has nothing to say about whether the hospital hands over your medical records to the government. And, in fact, it matters since they are the hospital records. Is this so much true in the Bond case? The fact that your luggage is sitting on a desk doesn't mean that you lose your privacy interests. In the Chapman case, the fact that it's the landlord who, at you, didn't change the Fourth Amendment analysis. In the Younger case. Even in Katz. In Katz, the person who was found to have a reasonable expectation of privacy was standing in a phone booth. He did not own that phone booth. But the difference with Katz, I think, was that it was content, right? I mean, in other words, they could hear what was being said. It wasn't at the level of just information that you turn over to your carrier just by virtue of using that technology. Well, yes, but I think that had been the argument before. You're right that it was certainly about content and it wasn't about non-content. But what Katz was saying is that the Fourth Amendment protects people, not places. And I think that if you think of the third-party doctrine as an on-off switch, you're firing backwards in that you're thinking about the places and not the people. The telephone records only exist because you make the call. The telephone company, you know, they have tons of records that have nothing to do with you. But this one you have a very important role in. It wouldn't exist without you. I understand that this is a brave new world and that the aggregation of all this information is unlike anything that we've dealt with before. But what I'm trying to understand is, you know, if we make this the rule, then, you know, what does that do? It seems to me the implications go out in many different directions. For instance, if you say that conveying information to a third party has nothing to do with it, then what happens to the use of informants, secret agents? All these kinds of issues invariably now have to be sorted out. And so that's what I'm asking is what line would you draw? Well, I would draw the reasonable expectation of privacy line, honestly. And I think the courts have really held that you don't have an expectation of privacy in sharing information about future crimes with an informant. The courts have held you don't have any reasonable expectation of privacy in possessing contraband. That's fine. Well, here we're talking about millions and millions of innocent Americans who are making their everyday phone calls and that the government is swooping that up. There's no reduced expectation of privacy in your everyday phone calls that you make. It's not like, you know, the special needs cases where you've got somebody who's running a train or students engaging in behavior. These are regular people making everyday calls who are being swooped up in this. And I think the failure of the government's position is that you can't take doctrines that were designed for specific situations and just decide that everybody is a suspect class, everybody has a reduced expectation of privacy. So I think you have to look at the scope of what the government's doing. And I think you can begin to draw the lines. Again, I don't think you have a reasonable expectation of privacy in a co-conspirator conversation. But is the line then whether it's legal or illegal activity? Well, that's certainly the line that the court has drawn in the contraband cases. You know, the other instance here is that the question is whether they need to find any kind of suspicion whatsoever. And here there is no suspicion whatsoever. They're trying to do away with that piece of what the Constitution protects us with. But you could imagine a special needs case or something where there was a category of people who you were looking into. A category of people in these stops for drunk driving, which are aimed at preventing drunk driving, not by catching people who are driving drunk, but not catching in the sense of then prosecuting, but making sure that they don't continue on their way. I mean, there's certainly no individual targeting there, right? The police pick a place that they think is particularly suitable for catching in the sense that I just explained, drunk drivers. The overwhelming majority of them are totally innocent. And yet everyone in that dragnet is stopped. Well, it's certainly the case that those dragnets – I don't think those dragnets would be supportive if they were everywhere and everybody. But the police have to do some targeting of places where they think they want to stop things. So this is completely indiscriminate. In terms of the drunkenness of the people who are stopped for purposes of that kind of program, it's completely indiscriminate. They're stopped because they're driving through a particular crossroads or down a particular street, not because there's any evidence whatsoever that any of them, any particular one of them, has ever had a drink. That's true. But in a human rights special needs context, you have sound categories. You've got people who are driving a train. People driving at the intersection of 1st and Main. Right. But that is sound tailoring that is going on. So in the SIDS case, for instance, the Michigan Department, the stop case, the drunk driving case in the Supreme Court, the court distinguished another case, the Proust case, right, where people were being stopped in order to check whether they had proper licenses. And what the Supreme Court said is the difference between SIDS, where we're looking for drunk driving, and Proust is that there's some likelihood that you're going to catch drunk drivers here. In Proust, it was completely random, and they didn't show any efficacy of what they were doing. Well, I understand the efficacy bit, obviously. That seems very strong, and I understand that Central Neon discounted any possible benefits to this, but it doesn't seem to me that there's much of a factual record supporting that discount. Well, the government here has admitted that it could accomplish these goals with less invasive means. The president has admitted that. Less invasive in the sense of the database seized, remaining in the hands of the phone companies until they are queried, right? But the same process of query would go on. There would be no difference, as far as I can make out, in the querying and no difference in the examination of the particular records found to be relevant in the querying. Well, the statutory, the legislative language is so inflexible. I would take for you that you're correct, but I think there is a Fourth Amendment moment, an important moment at the moment of collection. The moment of collection is when people are no longer securing their papers under this statute. In Berger, it's the moment that a conversation is seized that matters. Under the Wiretap Act, which was written in order to try to comply with the Supreme Court's decision, the moment of seizure is that's when an interception occurs under Title III. It's not what the government does afterwards. There may be a separate constitutional issue. Do you think it makes a difference whether the government collects, say, a trillion things and looks at 25 versus the government collects 100 things and looks at 100? I think there's a significant difference, Your Honor. Doesn't it count against you here? Because here the government, a lot is collected and virtually nothing is examined. Well, Your Honor, I do think it matters. First of all, nothing is examined largely as a result of government protocols, right? Yeah, but those are part of the case, right? Well, they are part of the case, but they're not part of the Constitution. I mean, I think that Justice Roberts was correct in Riley when he said the founders didn't fight a revolution in order to win the right to government protocols, and that is essentially what the government is arguing here is that their protocols keep you safe. Don't worry that they're collecting everything because their protocols keep them safe. And I think a contrary rule of court orders, right? There are court orders based on the protocols, but the reporting is, well, it's been stepped up in recent years. But a contrary rule wouldn't make any sense. I mean, when you think about why we have the Fourth Amendment to try to stop general searches, a rule that said it was okay for the king's troops to go into everybody's house and it only mattered what they told as opposed to the actual going in wouldn't matter. It would mean that the government could record every phone call, photocopy all the mail, all of the membership lists of organizations, and put a video camera in every bedroom. And, of course, it doesn't matter because they've got protocols and rules that say what they can do with it. I think the Fourth Amendment actually meant what it says, which is you should be able to be secure in your papers and not have to trust that the government will collect it, but they'll do the right thing with it after they receive it. I don't think that's consistent with the Fourth Amendment. I don't think it's consistent with what the Supreme Court was talking about in Riley or in any of the other cases when the government said, well, don't worry, we'll put together protocols, so even though we search everybody's phones, we won't search for things that are bad. The Supreme Court said, well, that's not sufficient. And I don't think it's sufficient here as well, even though they've got the Fisk Court supporting their protocols. Thank you. Thank you. Thank you, Mr. Court. Paul Smith for the Center for National Security Studies. Thank you for the opportunity to argue. As you know, our view is that the court can and should decide this case and affirm on the alternate ground that Section 215 does not authorize the NSA metadata collection program. The statute, if you read it as a whole, and we point to a variety of different features of Section 215. Before you get to the preclusion language and the defects in the statute, what do we do with the fact that Mr. Clayman has expressly raised this issue and modified his complaint with the consent of the district court to exclude the statutory claim? Your Honor, our position, and I think we have cases we cite for this, is that the court has the discretion in a situation like this, especially when the principle of constitutional avoidance is at stake, to decide the issue on statutory grounds at its own discretion. We haven't had a case where the court has done that in the face of an explicit waiver by the parties. Yes, Your Honor. There's a Fifth Circuit case we cite called the United States v. Underwood where both parties were disclaiming the statutory argument and wanted the court to read the additional argument. And the Fifth Circuit said, knowing it's appropriate for – it's in our brief, Your Honor. Thank you. The features of the statute that we point to are a variety of things. It's not just the relevance requirement, although that's important. It has to be relevant to an authorized investigation. But first of all, it's supposed to be done by the FBI, and the FBI is supposed to be retaining and maintaining and protecting all of these records. Wasn't the statute adopted with the background of an enormous amount of interchange between government agencies of data? The NSA has computer capabilities. The FBI does not. It was surely anticipatable. Well, Your Honor, I anticipated that the NSA would do the key sifting. That's if you assume that Congress had in mind that there would be some massive database created when they passed this particular provision for the production of tangible things. You were focusing on the NSA versus FBI issue. I'm just wondering how you're addressing that. I think what the FBI, being the identified agency, has specified over and over as being the agency that maintained the records, et cetera, suggests that they didn't imagine anything like continuous collection of everybody's sensitive records, which is what we have here, that they were imagining something, as the statute says, more like what you get with a one-time grand jury subpoena. You get relevant information about a particular investigation that is retrieved by law enforcement and then used for those purposes. The other thing that's, I think, important to recognize is the statute has a number of different features in other parts of the statute where they expressly are authorizing continuous collection. And every time that Congress did that in FISA, the pen register provision, the section 702 for intelligence surveillance provision, others, it always provided a time limit for periodic review of the continuous collections. Here, there is no such time limit. The FISC had to make all of that up and create out of whole cloth the entire structure under which this program is operating because the statute wasn't intended to authorize continuous collection of massive amounts of data that is entirely irrelevant to what the government is investigating. That's not what this statute was meant to do. The illusion in the statute to grand jury subpoenas, basically grand jury subpoenas and other subpoenas, suggests very broad sweep. I mean, there are loads of cases where the government collects data that's a huge multiple of the actual data it's going to find anything in. The largest grand jury subpoena ever allowed, I submit, Your Honor, must have been a tiny fraction of the amount of data that's being collected here. And there's always at least some category that makes sense. All the records of this doctor who's suspected of malpractice or bad activities, all the records of some corporation that is suspected, something that at least defines the records that are being collected other than everybody in the United States who is engaged in using a telephone, which they say is not every telephone company, but it's got to be pretty much all of them or the whole thing wouldn't make any sense. And so that I think is different in type than what Congress intended 215 to do. And, you know, under the doctrine of constitutional avoidance, you not only should address the statute first, your approach is supposed to be to try to construe the statute in a manner that avoids this major constitutional pronouncement that you're being asked to make here. And I submit if you look at all of those features of the statute together. How can we do that on a statutory claim that is not in existence? Do you have a case, and I'm not sure what Underwood said, do you have a case where it actually says we're going to base relief, not only on a different theory than the district court granted relief, but on a theory that was never even pled? Well, Your Honor, it was pled. It was litigated fully. It was decided by Judge Leon. It was abandoned. After the decision on the preliminary injunction motion, he filed an amended complaint to streamline his case. But it's not like you're acting without the benefit of a record below. All of this is in the record. All of it is decided. It's not just about the record benefit, but jurisdictionally. Do we have jurisdiction to base relief on a claim that is no longer made? I don't think there's any kind of jurisdictional limitation on this court's ability to avoid a constitutional challenge to government action by saying that the government. You may not think that. But I'm asking you for some reason why I should think that. I've never been in a case where we granted relief based on a claim that wasn't made. The Underwood case to the Fifth Circuit is an example of a court that said, we don't care that the parties are waiving this statutory argument. Was that a case in which they were using a statute to give a basis for relief that wasn't raised? You know, here you're asking us to retain in being extraordinary relief, based on something that isn't raised before us. Did that happen in Underwood? Well, it's not exactly the same on the facts, and I actually don't remember the specifics. Underwood had to do with certificate of appealability? Excuse me, Your Honor? Have I got the wrong case in mind, or was it a habeas type case? I honestly don't remember, Your Honor. I just remember that's the case where the court basically expressed they said it doesn't matter. So you don't know what Underwood was about then? No, I don't know specifics, Your Honor. I just know there was an express discussion there that the waiver of the parties of this argument is not to deprive us of the power. And, you know, the court, the Supreme Court has said this. This is not the ordinary situation of waiver of an argument. This is where you're actually asking us to grant relief based on something that's not solved. But that's what the principle of constitutional avoidance suggests is the right way for courts to behave in this situation. Instead of having this massive new constitutional situation. That's not usually the way constitutional avoidance comes up. I've been in a good many constitutional avoidance cases, but I don't think any of them involve granting relief based on a statute that wasn't raised before us. It was raised, Your Honor. It was decided below. There's a full analysis of it. It was waived after the court's ruling that is on appeal here, and I think in that situation at least this shouldn't be, I wouldn't think, controversial that the court should avoid the Fourth Amendment issue here. Look at the statute and construe it in the manner that avoids that issue. And, you know, the government responds that you're precluded from addressing the statutory issue because Congress created a review remedy for recipients of the orders. But I think that that argument has a variety of defects in it. First of all, there's no indication that Congress excluded anybody else because they didn't think the other people in ordinary courts would be aware of these orders. So you wouldn't create a remedy for people who weren't aware that their data was being collected from the custodians of records. There's no indication that Congress had an affirmative desire to put this court in a position of having to address the constitutional argument, which the government concedes is before you properly, but not decide in advance of that whether or not their actions are consistent with what Congress mandated. So I think that the block case on which they rely is entirely different, and there's no basis for finding that Congress intended that you be put in a position of having to decide a constitutional issue instead of looking at the statute, a statute which is, after all, enforceable. There's no indication in at least one of the cases, I think, for the FISA court, one of the recipients of the orders raised the constitutionality, perhaps the statutory question at any rate, raised whatever issues it raised on behalf of a particular telephone subscriber, and that suggests that telephone subscribers' statutory claims can get heard, even if the preclusive provision is read up to the hilt. Under our law, that thing of counsel of urologists particularly, that seems to be enough for us to stop looking for a way around preclusive language. The only time that such a claim has been brought was after Judge Leon ruled. This unnamed telephone company came back to the FISC and said, tell us for sure that this is what we're supposed to do. Judge Collier issued an opinion saying, I disagree with Judge Leon. I think it's constitutional. I think it's authorized by statute. Keep giving the data. But the reality is that the recipients of these orders have no incentive to enforce any of these statutory requirements. They're completely immunized from any liability for complying with the orders, and it's not their privacy that's at stake. And so that's why for many years up until 2014, no one- Why did the telephone company raise it then? Probably just because they wanted to cover themselves in case there was going to be some problem after Judge Leon ruled. That would be the natural inference. They didn't appeal it when Judge Collier said it's okay to keep going. So, I mean, I think that's a one-time event probably, or at least not an indication that the structure is such that we're going to have meaningful enforcement of these requirements in an adversarial setting. Now, obviously, it's the ex parte setting, but in terms of real enforcement by the recipients, they have no incentive to take that action except in that one-time situation. Now, the other thing I wanted to just mention, if you'll indulge me, is the government has this idea that all of this was ratified by Congress in 2010 and 2011. Years after the court started- they started collecting this metadata, and years after the FISC was authorizing them on these things, there was an extension, two extensions of 215, along with a couple of other statutory provisions in 2010 and 2011. There are multiple problems, I think, with the ratification argument that they make, but a central problem with it is they don't even claim that most members of Congress were aware of the program when they voted to extend it. Weren't there senators on the floor of the Senate saying, before you vote for this, you ought to go and look at it? Right, but we have no indication of how many senators took them up on it because they didn't know what it was. I mean, then the other senators, to the extent that that's true, the other senators apparently thought that the warnings of Senator Wyden and Senator Udall were- they were willing to go ahead in the face of them. But the question is, is the intent of Congress to authorize a program which is not authorized on the face of the statute? And that intent can't exist by virtue of the fact that the senators didn't heed Senator Wyden's warning and go to the secret room and read the secret memo, which they couldn't then tell anybody else about. We have no record that suggests that anything like the majority of Congress was aware of this program at the time they extended the statute. And the other thing is- this is a silly question, but it does come to mind. How do you compare it with the level of awareness of Congress, but generally, as to what they're not aware of? In the usual case of passing a statute, you assume that Congress intended what the statute says that they voted for. Here we have a statute that doesn't support what they're doing, I submit. And then five years later, what they're saying is we got it changed sub silentio by putting this memo in a secret room and having people read it or not go read it, and suddenly the statute means something different. All of this, by the way, happening without the American people having any awareness of it at all. It's essentially like they passed a new secret law that says they're going to be able to take all your metadata and put it in a vault somewhere and hold on to it. I think that this- ratification in this context is extremely troubling for a whole variety of reasons. In addition to the fact that they had three different programs that they extended in these laws, and so what Congress was forced- somebody was actually thinking I don't like this program. In order not to extend that and be charged with ratification, he would have had to shut down three different programs. And then he wouldn't have been able to tell his constituents, him or her, why he did it because it's a secret. You know, you're not allowed to even tell your other members of Congress why you did it. So the whole situation is fraught with problems in terms of ratification. That was my final point I wanted to make, Your Honor. Thank you. Thank you. You had 12 minutes remaining. Thank you, Your Honor. A couple quick points on rebuttal. First, a number of the questions that the Court has raised both when I was up before and to opposing counsel in Amici, I think correctly reflect that this program has to be assessed on the basis of what it actually is, not what the plaintiffs or Amici might fear it could be in a different version or in a different world. And here, the program exists in a particular way, not merely by executive discretion or choice. And, by the way, that would still be relevant, it seems to us. But here, because Congress passed a statute directing a court, an Article III court, to take action, and that court has taken extensive action, issuing multiple orders over many years, addressing many of the very same questions that the plaintiffs here have raised, explaining the basis for the program, and very carefully limiting how the program operates and how the government can use the data collected in this Section 215 telephony metadata program. So, for example, the judicial involvement requires now a prior judicial determination of a reasonable articulable suspicion. It requires extensive oversight, reauthorization every 90 days, careful limits on how the data can be used. Only after a query, the query can only show the two steps of contact. And, therefore, that all confirms the limited intrusion into any privacy interest. The President's own statements are also relevant here, both by emphasizing the importance of protecting privacy and the importance of preserving this capability. The President's speech and statement in March of this year, following his earlier speech in January, did emphasize, as well, the importance of transparency. And so the executive has gone on. What does that have to do with our decision? Well, just until one of the arguments on the other side is that the government has not disclosed everything. But, in fact, the government has disclosed far more in the context of this case than one would normally expect for a national security program. We've done a great deal, as the President emphasized, to ensure transparency and a robust debate about this program and thereby made available the very public materials that the plaintiffs. Did we establish a precedent that the speeches of a President are part of the record for reviewing the grant of preliminary injunction? Your Honor, I don't think it needs to be part of the record. This Court can, of course. So you're arguing outside the record. That's not what we normally expect out of you. Well, Your Honor, I appreciate that. I think I've made the point about the Court's involvement in the limited use of the program. The Court's questions also correctly reflect that it's not accurate to articulate fears about the possible uses of this metadata when we do know, because of the FISC orders that have been released publicly, exactly the limitations that the Court has imposed on that use. And therefore, the relevant questions are, is there any possibility that information about these plaintiff's phone calls would actually be reviewed by any person? And that contrasts this program with the kinds of cases that the Supreme Court decided, highlights the very lesser interest in privacy here, because unlike, for example, in Smith and Miller, in the many criminal cases the Supreme Court has decided, the government is not using all this information in order to go after individuals. That reiterates, then, that the government is arguing that there is not a violation in the obtaining of the data in and of itself. That's not a Fourth Amendment violation. Absolutely, Judge Stentell, and I think Judge Williams, one of your questions earlier, reminded me of an important point in that aspect. If the King's soldiers go through your papers, but don't do anything with what they find in your papers, has the Fourth Amendment not been violated? Well, Judge Stentell, there's a possessory interest in the facts, of course. The Supreme Court recognized that. This Court has, too. So it's a very different question than when one's individual effects or property interests have been invaded. And that's, of course, the data for Jones. Property is the interest protected in the Fourth Amendment. It's certainly the historic base property. And it's the basis relied on by the opinion of four. I don't know whether that's the one that Senator Mayer joined in Jones, to make five. But the protection of privacy is the interest relied on in Katz and then by the Alito concurrence in Jones, recognized by the Scalia opinion in Jones. Property is an important interest. And it's the original interest the Court's talking about. But it's not the only one. Is there not a privacy invasion in the very fact of reviewing who you get phone calls from? I mean, you're collecting who you get phone calls from. Judge Stentell, there's not. And let me emphasize that you're absolutely right. Both property and privacy are in play and protected by the Fourth Amendment. What we know about in this case is that the property interests are those of the telephone company. And that as in any subpoena context, records can be subpoenaed without implicating Fourth Amendment concerns. Dionisio is one example of that. Justificandum, the many other grand jury cases we've cited for subpoenas, Duke and Tecum also make the point. This Court in Maynard is, of course, that's the Jones point. But this Court in Maynard, talking about the privacy interest, emphasized also that distinguished the Supreme Court's decision in Smith and made the point that the customer in this context, the context of metadata, actually expects all phone numbers dialed to be collected in a list, unlike an individual traveling on the public streets who might not expect that aggregation. I think, Judge Williams, that goes to the question we were talking about earlier, doesn't it? So I would think that it's important, again, to focus on this program and the nature of it. Mere collection alone is not sufficient. Judge Williams, you were asking earlier, if the government collects, let's just pick a number, a million whatevers, and then only looks at two of them or 25 of them, it's a very different case than where in a criminal investigation the government looks at everything in an effort to prosecute the individual descendant. Here we have that example where mere collection alone. Here they're looking at them in order to decide whether to prosecute, not just in order to prosecute. To be sure, Judge Pentel, but here, remember, it's that very looking that's limited by the FISC orders, and that's an important privacy protection. So in the end, it comes down to whether Smith controls or doesn't. And we think Smith clearly does control here. Yes, before we settle on that proposition, if we said Smith was inapplicable, that would take us to the issue of reasonableness. And if we get to that, what's the relationship between the alternative program outlined by Professor Felton in his second declaration and the President's plans, I guess even proposals for change of the program? In other words, both of those seem to be intended to remove the collection, let's say the government collection aspect of the program. So Judge Williams, the various alternatives that have been proposed, including the one the President has urged Congress to pass, and that in fact one House of Congress has actually passed the bill along those lines, all of these alternatives are predicated on an important fact, which is under current law we could not do, we could not meet this need. We couldn't fill the gap that the President and the intelligence community have identified without doing it pursuant to the Section 215 program that we have in place. We would need a different legal structure. We would need new legislation in order to adopt any of those alternatives. That's the point that the President made. It's the point that we think is relevant here. It's also important to recognize under- I'm just not sure how that fits in on reasonableness. Well, Your Honor, that's my next point. On reasonableness under the Special Needs Doctrine or reasonableness generally, there is no requirement that the government adopt the least restrictive means of accomplishing its compelling interests or furthering its goals. Instead, the case law is clear under the Special Needs Doctrine that the program need only be a reasonably effective means of accomplishing those goals. And here the evidence in the record, including the Shea Declaration, the Hawley Declaration, do make clear that it is clearly a reasonably effective means of identifying terrorist contacts, both within and outside the United States, in order to help prevent terrorist attacks against the United States. That's a compelling government interest, indisputably, I think. Plaintiff's own brief acknowledges that. Do you think national security is itself an exception to the warrant requirement, or do you need special needs to- Well, Judge Brown, we haven't made that argument. I don't think there's any basis for- there's any need for this Court to even address an argument that would be that broad in scope. There are a number of exceptions that the Supreme Court has recognized as reasonable under the Fourth Amendment, short of a warrant requirement. The Special Needs Doctrine is one. We think this case fits neatly within it. All of them, of course, require, as Maryland v. King is another example, all of them require a balancing of government interests against the degree of an intrusion of privacy. And in that context especially, it's important to recognize the limitations in the Fisk Orders on the use of this information and the fact that, for the vast majority, all but the tiniest fraction, none of this metadata will ever be seen by any government analyst and that any use of it is carefully limited and overseen by the courts. So, turning briefly to the point about the statutory arguments raised by one of the amici, I'd like to emphasize, I think Judge Santel's question highlighted that what that issue here is a preliminary injunction that the district court has entered against the operation of a government program. There is no way to support a claim, and remember under the preliminary injunction standard, plaintiffs must show a likelihood of success on the merits. There's no way to support that determination with respect to a statutory argument that plaintiffs have not only abandoned, but have expressly withdrawn in the district court itself by filing amended complaints that no longer rely on that basis. So, if there were any question about whether the district court should, the plaintiffs should have talked about a statutory claim that's not in the case, the only answer would be that this court should reverse and vacate a preliminary injunction that's not supported by the kind of argument that amicus now thinks is the only appropriate one to invoke. The fact is, however, that the plaintiffs have raised a constitutional claim and that's what's before this court. That's the basis for the claim in the district court. Remember, too, the district court actually found in the government's favor on preclusion that the FISA itself precludes this kind of claim. So did the district court in the Southern District of New York. You were saying if we addressed the statutory issue and found it to be a winner, we would have to vacate the injunction, and then what? I'm not sure. I don't even think you'd have to address the statutory claim. I think if you agreed, and I see my time's expired. I'd like to finish answering your question. If the court were to agree with amicus that the statutory claim must be raised in a case like this before the case can be decided, the answer to that question is that there's no support for the preliminary injunction that the district court entered, and it must be vacated and withdrawn. I would also emphasize, though, that if there's any reason for the court to believe this information, if this argument is correctly in play, we would like to address it in a supplemental brief. We don't think that's necessary, but it's important. Why would that follow? I mean, it tends to me as if the concern you're voicing could be met by our addressing the statutory claim. Of course, if we rejected it, it can go on to the constitutional claim, no problem. If we accepted it, then we would still have to vacate the injunction because it was based on something totally different from the plaintiff's claim, but perhaps that would be the thing to do. Well, I think, Judge Williams, there are multiple reasons to reverse the injunction in this case. Now, what I've emphasized in this point is very limited. I think it just highlights, really, the strange nature of the argument raised by amicus, which is that an argument that plaintiffs, as masters of their own complaint, have not invoked, not relied on and expressly withdrawn, that was decided against them in district court, that they've abandoned on appeal as well. Those are two separate reasons that the court should not address it. If there were any reason to doubt, nevertheless, that that argument should still be in play, the proper basis wouldn't be for this court to uphold the preliminary injunction, but to vacate and reverse it on that ground as well as the many others we've raised. Isn't that outcome completely different from what happened in U.S. National Bank of Oregon, where I think both parties disclaimed the issue and the court charged ahead and resolved it on the ground that it had discretion to resolve logically anterior issues? Your Honor, I'm struggling to remember the facts of the National Bank of Oregon case, but... Basically, the fact was discovered, I think, in the course of oral argument here, that it was quite possible that the statute that the parties were arguing about had never, in fact, been lawfully enacted. It is. It does seem rather anterior, but it's more so, I think, than the statutory claim. I see. And there, of course, the statute itself was in play in the case. I guess I think a better meaning of the statute, yes. Yes, to be sure. Now it's existence. But the meaning turns on its validity, of course, right? I guess another case we would point to, and it's one that we didn't cite, but would be happy to provide to the court if necessary, is the Supreme Court case from 1993 called Zobrist against Catalina Hills, talking very specifically about the constitutional avoidance rule and making the point that the mere fact that there may lurk in a case a nonconstitutional ground for decision is not a sufficient basis to invoke the rule of constitutional avoidance. That case is at 500 U.S., page 1, again, 1993, by the Supreme Court. So I guess I'd also like to... Oh, I see my time's expired. Judge Brown, you had raised a point about the conceptual implications of this case. And if I may, I'd just like to point the court to one of the authorities we relied on in our briefs that the district court also discussed, and that is the article by Oren Kerr about the third-party doctrine in which he makes the point that because the exclusionary rule is the ordinary remedy for violations of the Fourth Amendment, that it's very important to have a bright-line standard in place for law enforcement to follow. Smith provides that, Miller provides that. The arguments that plaintiffs and their amici have invoked would not permit that and would raise the very kinds of concerns I think your question raised, Judge Brown. I noticed that the plaintiffs made no mention in their argument of their cross-appeals, so on that point we would rest on our briefs. Thank you, Your Honor. We'd urge you to vacate and reverse the district court's injunction. Thank you very much. There is a cross-appeal, so he would have perhaps two minutes to answer it. Two minutes. If you shouldn't restrict your time to the cross-appeal. Yes, Your Honor. And central to that cross-appeal is that Judge Leon did not reach the First Amendment issues in this case. He felt that it was sufficient to decide them on the Fourth. But under the Supreme Court's decision in NAACP 357 U.S. 449, this has a chilling effect on free speech, the fact that everyone's records are being obtained by the National Security Agency and other intelligence agencies. The NAACP case is a very strong case. I'm a plaintiff. I'm a public advocate. I'm the head of a public interest group. And as a result, it does have a chilling effect on people coming to see me, talking freely, being able to defend themselves against actions by the government and others that have harmed them. Do you feel you're targeted the way the NAACP was in Alabama at the time of that case? Your Honor, I don't want to be overly presumptive in being targeted, but I think you all know me to some extent. I'm a very strong public advocate. I take strong positions. I have challenged presidents before. So am I being targeted? I'd be surprised if I'm not. With regard to the issue of grabbing everybody's records, clearly the NSA and the other government defenders could go to the telephone companies with a particularized showing of probable cause or reasonable suspicion. They don't have to grab everybody's records. But if there's a reason to believe, a reasonable reason, that in fact someone is in contact with a terrorist organization or terrorists, they go in that specific need, not to grab everybody. And the extent of the constitutional violation here is huge. It's beyond any imagination in American law, as Judge Leon pointed out. And for this government to come in front of us and to say, we don't look at identifying information, we don't violate the privacy of individuals because we don't know who they are, flies in the face of the NSA's own Inspector General, and this is a matter of the record, who found during a very limited period of time, I believe it was six months, over 2,000 violations of Section 215 and the Constitution. So they themselves are not being candid with this court, the government defendants. They do systematically violate those rights, even to the extent that they're getting into the communications of people that they're worried about are cheating on them in their private sex lives. The capability here is enormous, and this has, going back to the Cross Appeal, notwithstanding the Fourth Amendment issues, huge implications on the First Amendment, of the right of free speech and the right of association. This cannot be permitted in a civilized society. The American people don't need to be under the sword of Damocles. Every moment they pick up their phone to make a call, and myself in particular when I talk to a client in a public interest capacity. I thank you for your time. The American people look to you to protect them from the tyranny of this current government. Thank you. Thank you.
judges: Brown, Williams, Sentelle